I'd like you to make your arguments, but if you can, keep close to the timeline. And we will proceed as if we're in the courtroom, so we will interrupt you. Because we're on Zoom, please finish your statement and go to the question, if we ask you in the middle of a statement. Mr. Schumacher. Thank you, and welcome to the court. Again, my name is Daryl Schumacher, and I represent a 12-year-old firm, and one of our senior employees. The 12-year-old firm entered summary judgment in favor of defendants and against the retirement plan based on two elements of the retirement plan's breach of fiduciary duty claims, materiality and damages. I'd like to cover both of those issues briefly, starting with the issue of materiality. As your honors are aware, this case involves the retirement plan's purchase of retiree health care benefits through the CTA. The retirement plan acted through a board called the Retirement Allowance Committee. I may refer to that as the RAC or the ROC for today's purposes, but each defendant in this case was a member of the RAC. As to materiality, it's our intention, your honors, that defendants' knowledge of the CTA's receipt and retention of prescription drug rebates is material to their duties to the retirement plan as RAC members. I'm going to ask you a question. In your briefs, your opening and your reply brief, there is something that is hardly mentioned. It's not mentioned at all in your reply, and it's not mentioned or argued at all in the opening brief, and that is the concept that what we have here are administrative costs. Now, the defendants talk a lot about the fact that what's at issue here were administrative costs for operating the plan. It had nothing to do with the price of the drugs. This was used for administrative purposes. You don't seem to have that anywhere in your briefs. Am I missing something, or did you, for some reason, not wish to discuss it? It's not that we didn't wish to discuss it, your honor. I guess our position is we don't agree that the rebates are administrative costs, and in fact, there's evidence in this case. They disagree. You didn't tell us that. I mean, there's nothing. All we have is their arguments. If you disagree with it, should you have pointed that out to us? We should have, your honor, and I apologize for that. The contract between the CTA and Caremark specifically characterizes these rebates, and I apologize. I need to put on my glasses for this. This is at record site C2629V2. It's section 2.4 of the agreement, your honors, between Caremark and the CTA. What this contract says is that it is the intention of the parties that for purposes of the federal anti-kickback statute, these client credits shall constitute and shall be treated as discounts against the price of drugs within the meaning of section 42 U.S.C. 1320A. That's the anti-kickback statute. So, your honor, you're absolutely right. We should have been more clear about that in our briefs. The defendants have argued that they applied them to administrative costs, but it's our position that these were discounts in the price of drugs, and there's evidence supporting that along the lines. Do you have any evidence that they used it for any purposes other than administrative costs? The rebates were cataloged in the GL ledgers against the cost of prescription drugs. Well, when you say that, I mean, that's part of the issue, but were they used for administrative purposes only? Do you have any evidence that the rebates were used for anything other than administrative costs? No matter how you might describe them, the money was used for administrative costs. Is there any evidence otherwise? Your honor, the evidence would be that when the CTA received the rebates, the way that it accounted for them was offsets to their prescription drug expenses. I mean, money's fungible. I don't know how else we can articulate that the money was spent on administrative costs versus something else. The way that the CTA, from an accounting standpoint, dealt with these rebates was that it allocated it against the cost of prescription drugs. So, that would be the only evidence that I have, your honor. If that answers your question, your honor, with respect to materiality, it's our contention that defendant's knowledge of the CTA's received retention of prescription drug rebates is material to their duties to the retirement plan as RAC members. The retirement plan contains that materiality is measured by an objective standard. The cases that both parties have cited articulated that standard slightly differently, but regardless of which definition you apply, each defendant's knowledge is material for a number of reasons. First, one of defendant's responsibilities as RAC members, the monthly consideration and approval of invoices relating to retirement healthcare, and specifically prescription drug expenses. The monthly invoices, the CTA extended the retirement plan, didn't reflect the prescription drug rebates anywhere, didn't even reference them anywhere in the invoices. Defendants knew about these, about the CTA's receipt. Mr. Kellyannis, he knew about it in February 2007. That's a defendant, right? That's what the court held in the prior case. I believe it was February of 08, but I could be mistaken, your honor. I think it's 07, but we as his mate, and you're not contesting that speculation? No. And excuse me, his official position was what, Mr. Kellyannis? Mr. Kellyannis was the executive director of the retirement plan. He was an administrator. So how can that not be imputed to the board? The trial court did impute his knowledge to the board as of 2007. And the appellate court affirmed that, correct? That's correct. As of 2007. These rebates began in 2003. And actually the Caremark rebates began in 2004. So materiality is measured by an objective standard. Do you have an answer to Justice Coughlin's question? I mean, a question, how can it not be imputed, his knowledge, to the defendants here? How can Mr. Kellyannis' knowledge be imputed to the defendants? You're saying it's not imputed. You're saying it's not imputed to the defendants. That's your position. To the board, right? To the board. That was in 2007. And I guess what I'm focusing on is from the period 2003 until 2007. Nobody knew until 2007, right? No, that's not correct, your honor. Each defendant knew prior to 2007, some as early as 2003. Knew what? About the CTA's receipt and retention of prescription drug rebates. And that is in the prior case or is that in this case? I believe it's in this case. I believe it's in our brief. Each defendant was aware and certainly in the summary judgment papers that are part of the record. But each defendant was aware of the CTA's receipt and retention prior to 2007, prior to Mr. Kellyannis becoming aware. Okay, that wasn't my recollection of the facts in the prior case. I'm just saying. I don't know, what am I missing? You know, I mean, is there something? At least one defendant was aware of it as early as 2003. But isn't it, isn't the point that from 2007 going on after that, that the board did nothing about this if they had knowledge of it? Not exactly, your honor. In 2009, the retirement plan no longer had the obligation to provide for health care. Right, I understand that. But they did nothing between 2007 and 2009 to find another provider of prescription drugs or anything else that the CTA was doing, right? You're right, your honor. But that's because in 2008, there was already legislation in place that established the retiree health care trust was going to take over that obligation. Isn't that a little different than what you argued in your brief? I don't think we argue that. Maybe I'm misunderstanding. I think what you're arguing is that from 2007 until when the new provider came on board, you're saying now that you, before 2009, you knew that someone else was going to be taking over in 2009, so that's why nothing was done? Well, I think the reality is nothing was done because the CTA and the retirement plan were negotiating how these credits were going to be allocated. I understand that the court precluded the retirement's claim for breach of contract based on statute of limitations and based on the voluntary payment doctrine. But the entire period prior to Mr. Kalianas' knowledge would certainly be in play with respect. The only people on the rack that were aware of it prior to 2007 were these defendants. Your honor mentioned imputation of knowledge, which is another reason we believe that defendant's knowledge was material. The circuit court in the prior case, the CTA case, imputed Mr. Kalianas' knowledge of the rebates as well as each of the four defendants. According to the restatement of third of agency, notice of a fact to an agent is imputed to the principal if knowledge of that fact is material to the agent's duties to the principal. Put another way, only material information can be imputed from agent to principal. Here, we believe that because the CTA imputed defendant's knowledge to the rack, likewise, the knowledge was material and likewise it should be material in this case. The issue is whether it's material or not, right? Correct, your honor. So, where in the record is there a dispute with regard to the fact that the CTA negotiated rebates to defray administrative costs? My understanding is from what the trial judge said that there was no evidence of that. First of all, am I correcting what the trial judge said? There was testimony from the individual defendants that the CTA allocated those rebates to offset administrative costs. But your honor, my position is that they didn't do that. My position is those were discounts on the price of drugs. I understand, but you have a different way of looking at it. But I want to know what evidence you have that they were other than rebates. I mean, other than rebates to defray administrative costs. You read a part of the contract with Caremark. Is that the only thing that you have? Well, I think the Caremark agreement, which is between the CTA and Caremark, is some of the best evidence about how those two parties treated these rebates. And they were treated as discounts against the cost of drugs. We believe that's pretty strong evidence that they weren't intended to offset administrative costs. They were intended to offset the price of drugs. Intended by whom? The parties to that contract, Caremark and the CTA. But as I understand it, in the depositions, the defendant said they knew about the CTA's retention of the rebates. But that the information was not material because the rebates did not reduce the actual cost of the prescription drugs. That was their testimony, your honor. And I believe that the judge can follow that in the summary judgment. Well, I believe it's inconsistent with the plain language of the Caremark agreement. Well, you may disagree with that ruling, but you only have that one paragraph, apparently. No other testimony or anything that supports what actually happened. I mean, there's something to be in a contract. That may not be what actually happened. I understand, your honor. And again, the issue is materiality. And I guess our position is, regardless of what those rebates were used for, knowledge that the rebates existed would have been material to these RAC members. It's relevant to what they do. If the retirement plan, which by the way, the retirees purchased the overwhelming majority of prescription drugs. If they had the ability to go get a better deal elsewhere, that was relevant to their evaluation. But it wasn't offsetting the prescription drug cost. That's the whole concept here. I mean, that is the key factual issue in this case. So you won't accept that, and therefore you win. But we need to look at the record and what evidence there is, and what the judge reviewed since we look at this de novo. And it doesn't seem you have anything to support what actually occurred here. Judge, again, the issue is materiality. That's what the trial court ruled against the retirement plan on that element of the duty claim. And regardless of whether those rebates were applied to administrative costs, prescription drug costs, the information, defendant's knowledge was relevant to their duty to the plan. It would have been important for RAC members to know that these prescription drug rebates existed, how they were being handled with respect. No, that's not the law. The fact is that if they're not relevant to the prescription drug costs, they're not material to your clients. Your Honor, we would respectfully disagree. If the buying power of the retirees and their purchases of prescription drugs are generating these rebates, that's important information for each member of the RAC to be aware of. Why? Because somebody's got to administrate this program, right? There's costs there. You're saying that you should ignore that? Who's to pay for that? Who pays for the administrative costs? Nobody? All I'm saying, Your Honor, is that... Who pays for the administrative costs? The CTA paid for the cost of administrating its plan. The retirement plan also had an administrative cost. I'll move ahead to one of defendant's primary arguments in this case, Your Honor, is that... Defendants have argued that because we didn't establish an entitlement to the rebates, that they can't be material. We believe that argument is flawed because the law doesn't limit the universe of material information just to property concerning trust. Defendants state the restatement second of trust for the point that the trustee only has a duty to furnish information to a beneficiary if the information relates to trust property. Section 173 of the restatement second of trust is broader than that. And defendants even state to the comments of that section, the comments provide that the trustee is under a duty to communicate to the beneficiary material facts affecting the interests of the beneficiary. So it's not just limited to trust property. It's anything affecting the interests of the beneficiary. Defendants cite the restatement second of agency as well, which imposes a disclosure of all information that's relevant to the affairs entrusted to the agent. Here, we argue that these rebates, whether you call them prescription drug rebates, discounts, they were relevant to the function of the RAC, which was to operate the retirement fund. The RAC was the body through which the retirement plan acted. We believe it's broader than just trust property as defendants suggest. We also believe that prescription drug rebates were material despite the fact that there was evidence, a lack of evidence that the retirement plan would have acted differently. As to materiality, the standard is objective. It's what a reasonable person. Unless your honors have questions about materiality, I'll move on to damages and address it very briefly. I know my time's running out. In a footnote, the trial court found that the retirement plan didn't establish damages. We believe that holding was error for two reasons. First of all, the rebates themselves were sufficient to establish a question of fact, which as to damages, I think is the appropriate standard, whether there's a disputed question of fact. Contrary to defendant's argument, these were not general contract incentives. They were rebates that were provided from Caremark to the CTA. Your honors held in the appeal of the CTA case that the circuit court didn't make a finding of fact as to whether the rebates were discounts on the price of drugs or general contracting incentives. That's an open question. And it's a significant question. It creates a question of fact as to whether the retirement plan had an entitlement to the rebate. Lastly, your honors, the retirement plan, we believe, asserted other forms of damage claims. Defendant's failure to disclose the rebates prevented the retirement plan from making an informed decision as to whether purchasing healthcare through the CTA was in the best interest of the retirement plan. I think that's all I have, your honors, unless you have further questions. Any further questions? You may proceed. Good afternoon, your honors. Please do let me know if you cannot hear me at some points because at certain moments, the opposing counsel was tuning in and out for me. May it please this court. Your honors, this afternoon, I will explain that there are two independent legal basis for affirming summary judgment in the defendant's favor in this case. First, the scope of the fiduciary duties that the defendant's owed to the retirement plan, in this case, did not extend to the subject matter of this litigation, the KMRC rebates. And so the duty of disclosure was never triggered. And second, it's plaintiff's complete failure of proof on the issue of damages, because despite extensive oral and written discovery in this case, which the trial court did allow over defendant's objection, plaintiff failed to come forward with specific evidentiary facts showing that it sustained damages because of defendant's non-disclosures. With respect to the scope of fiduciary duty, we do believe that analogy of the trust law is informative. And it's appropriate here because plaintiff itself refers to the Retirement Allowance Committee as a board of trustees and to defendants as defendant trustees throughout its briefs. What relevance does the contract have with KMRC? The counsel read a paragraph from that contract regarding rebates. The question is about the anti-kickback provision in the KMRC contract. We believe that this provision is quoted completely out of context and it constitutes a boilerplate provision in all contracts addressing federal payment, contracts involving federal reimbursement of funds. And so it's a statute, so it defines what's the purpose of rebates, not for all purposes, but for purposes of the specific statute, the kickback statute. It's a federal criminal statute that provides penalties for kickbacks and for criminal penalties for acts involving federal healthcare programs. There is no showing here at all that this provision is implicated here. There is no allegation, has never been any allegation either in the prior case against the CTA or here that there are any kickbacks involved. And the statute, it has a very sophisticated definition of what constitutes a kickback, an impermissible illegal kickback. There has to be knowledge, there has to be acceptance of funds from someone in cash  in exchange for payment, which will afterwards be reimbursed by the federal government. It just doesn't apply here. This provision does not apply here. And the plaintiff never argued that, never argued the facts demonstrating that there is any federal healthcare program payment involved. And indeed the circuit court in the prior case heard the evidence. I mean, the same argument was made in the prior case when there was a bench trial. There was a four-day bench trial in which the circuit court listened through the evidence. It read the contract. This provision was argued to the circuit court and the circuit court, after listening to all the evidence, examining the contract, listening to witnesses testifying about their understanding of the contract, held that the mechanics of the KMR contract support the CTA's interpretation. That the facets of the KMR contract suggest that rebates were a general contracting incentive to the CTA and not a direct discount on the price of drugs. And the circuit court in that case did explain its reasoning. It stated that the contract expressly provided that the rebates would go to the CTA as the contract owner, not the plan. The plan was not a part of the contract. It had no liabilities under the contract whatsoever. It did not participate in negotiation of the contract. Rebates were paid on a quarterly basis in a separate check while the actual cost invoices were billed monthly. They were invoiced monthly and they were paid monthly. And the rebates were calculated based on the total number of the CTA employees, both active and retired, not based directly on the retiree purchases. Also, I would disagree with counsel's characterization that rebates somehow were credited against the price of drugs. They were not. And the evidence was conclusive at trial that the rebates were not credited against the price of drugs. And the- You're referring to his argument about the accounting? The accountant, yes. It's Sharon Wheeler, the accountant, the person from the CTA who testified. And her testimony is in the record in this case. And what she testified is that there was an accounting ledger with different columns for third-party healthcare providers for the CTA. And so, because there are a number of them, there are a lot of them, not just Caremark. And what she testified is there was a specific column for Caremark expenses and the CTA accounted for the rebates in this column. But the column was not limited to just drug prices. I mean, it was all inclusive, the expense of the Caremark contract as a whole, which would include the administrative expenses as well. And then the counsel asked, on cross-examination asked, but was it feasible for the CTA maybe to separate this column into two different columns and account in one column for the price of drugs and another for administrative expenses? And Sharon Wheeler testified, well, hypothetically, we could have done it, but there would have been so many columns in this document, which is already huge. I mean, the document was huge. The counsel needed the loop to actually look at the numbers. And so, as it was, the expenses were accounted in one column, Caremark column, and it included all expenses, both drug prices and administrative expenses. And there was really, there was an overwhelming evidence in the prior trial that Caremark rebates were used to offset administrative costs of the CTA. I mean, the only evidence that counsel cites right now, and it's very significant, the only evidence is the evidence that had already presented in the prior case during the trial. There is nothing new, nothing new. And it's the testimony of the executive director, Talianis, who believed, who had the unilateral expectation, as the circuit court found, that the rebates constitute a discount against the price of drugs. The court weighed it against all the evidence that the court heard in the bench trial and concluded it was not compelling evidence that rebates were an asset of the plan. And indeed, we believe, by analogy with trust law, because trust law is very clear that trustee owns the duty to disclose complete and accurate information to the beneficiary, but only as it concerns the trust property. And I do have the restatement of trust, section 173 in front of me here, due to patronage information. And I cannot find in the comments what counsel was referring to, that somehow my rendition of this principle was incorrect. I think there is a common deed that talks about self-dealing, like if a trustee self-deals with the beneficiary, then maybe the duty is a little broader. You have to disclose all information about the transaction. There is no allegation here of self-dealing. No one self-dealt here. And in terms of our case from Hawaii, which Hawaii is known for trust law, but the plaintiff in its reply, it actually cited the case from Illinois, from this very court, first district, Obermeyer, on page three of its reply, in which the first district held that outside of the trust relationship, a trustee may deal with the beneficiary as if no fiduciary relationship existed. And the fiduciary relationship will not extend to non-trust property. So if the rebates are not trust property, then there is no fiduciary duty to disclose information as to that. Fiduciary duty does not extend to transactions that do not involve the assets of the trust. It's Illinois case law. In this very issue, whether rebates constituted the assets of the trust, this very issue was explored and litigated fully in the client case. And the context is- What about the issue of monetary damages? What's your response to what counsel had to say? Excuse me, you're very quiet. Could you please repeat? On monetary damages, what's your response to what counsel had to say? Well, there is no proof of damages here. I mean, there is absolutely no proof of damages. As the circuit court held, I mean, the only damages that plaintiff's expert identified are the rebates and expenses associated with rebates. But the plan has already failed to prove its entitlement to the rebates. The plan comes up with an alternative, a creative theory that if the trustees knew about the KMRC rebates, maybe they would have ventured outside of the boundaries of the CTA healthcare program and secured their own pharmacy benefit management contract. I mean, the problem with this argument is that it was not pled in the complaint. It was not explored in discovery. Plaintiff's own damages expert did not identify this as an item of damages in his deposition, and he was asked to articulate all potential damages theory. He did not. And so what we have is this counsel's argument. It's not enough to withstand summary judgment. In the summary judgment, it's not enough to appeal to logic  or supposedly should be obvious to people or to rely on conjecture or speculation. Under summary judgment standard, what plaintiff had to do is produce some deposition testimony, maybe from another, some other non-defendant board member who would have said, yes, if I knew about the rebates, maybe I would have made a motion to explore this issue of securing prescription drug coverage elsewhere. But the plaintiff doesn't have it. I mean, just because it could have been or might have been feasible theory of damages. I mean, it's too late now. It went summary judgment. The retirement plan had two chances to prove its theory of the case. Two chances. It was granted discovery and a chance to go through trial in the first case. And it was over defendant's objections. The circuit court allowed complete and full discovery, in this very case. And despite all of this, what did the retirement plan do? It re-deposed defendants. It re-deposed defendants. It produced the damages expert who didn't identify this new theory as an item of damages. And so there is complete lack of proof on that alternative theory. Apart from argument by my able opponent, there is just nothing. It's not enough to withstand summary judgment. So that would be our position on damages. Are there any other questions? No. Thank you very much. Appreciate it. Thank you, Your Honor. I'll be very brief. Council referred to the provision in the Karamark agreement as a boilerplate provision. That provision described exactly how the parties were treating the rebates and that they were discounts on the price of drugs. The fact that there's no sort of kickback I don't think is really relevant. If it wasn't true, they couldn't have put it in there. CTA in the Karamark treated those rebates as discounts against the price of drugs. And the contract is the best evidence of that. I don't think I have anything to add other than we're certainly going to be brief here unless there are questions. Very much. Appreciate your arguments. Appreciate your briefs. We'll take the case under advisement and you'll hear from us in due time.